ETH

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA



ELIZABETH VARGAS ON BEHALF OF   :   CIVIL ACTION
B.L.D.T.V.      :

                         :

     v.                         :   NO. 12-03317

                         :

CAROLYN W. COLVIN,[1]         :
ACTING COMMISSIONER OF      :
SOCIAL SECURITY            :

**FILED**

OCT 3 1 2013

MICHAEL E. KUNZ, Clerk
By ____ Dep. Clerk

## REPORT AND RECOMMENDATION

ELIZABETH T. HEY, U.S.M.J.                                   October 31, 2013

This action was brought pursuant to 42 U.S.C. § 405(g) to review the final

decision of the Commissioner of Social Security ("Commissioner" or "Defendant"),

denying the application filed by Elizabeth Vargas ("Ms. Vargas") on behalf of her minor

daughter B.L.D.T.V. ("Plaintiff"), for supplemental social security income ("SSI") under

Title XVI of the Social Security Act. For the reasons that follow, I conclude that the ALJ

erred by failing to discuss Plaintiff's Global Assessment of Functioning ("GAF") scores.

I am also unable to conclude that the ALJ's functional equivalency determination was

supported by substantial evidence. Therefore, I recommend that this matter be remanded

for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

---

[1] On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of
Social Security. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure,
Carolyn W. Colvin should be substituted for the former Commissioner, Michael J.
Astrue, as the defendant in this suit. No further action need be taken to continue this suit
pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

# I. PROCEDURAL HISTORY

Plaintiff protectively filed an application for SSI on November 26, 2007, alleging disability since November 1, 2006. Tr. at 52, 102, 128. The application was denied on April 1, 2008, and Plaintiff requested an administrative hearing on May 29, 2008. Id. at 54-60. On July 28, 2009, an ALJ held a hearing to consider the matter de novo. Id. at 32-51. In a decision dated April 15, 2010, the ALJ denied the claim. Id. at 16-27. On April 11, 2012, the Appeals Council denied Plaintiff's request for review. Id. at 1-3. Therefore, the decision of the ALJ is the final decision of the Commissioner. 20 C.F.R. § 416.1472.

Plaintiff filed her complaint in this action on June 19, 2012, and filed a Brief and Statement of Issues in Support of Request for Review on October 12, 2012. See Docs. 3 & 9. Defendant filed a response on November 16, 2012, to which Plaintiff subsequently filed a reply. See Docs. 12 & 13. The matter is ripe for review.

# II. LEGAL STANDARDS

The court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); Richardson v. Perales, 402 U.S. 389, 401 (1971); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Therefore, the issue in this case is whether there is substantial evidence to support the Commissioner's conclusion that Plaintiff is not disabled. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate," and must be "more than a mere scintilla." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 118 (3d Cir. 2000) (quoting Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999)). The court

2

has plenary review of legal issues. Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999) (citing 42 U.S.C. § 405(g)).

In the context of determining whether child benefits should be awarded, the Commissioner employs a three-step sequential evaluation that examines: (1) whether the minor has engaged in substantial gainful activity; (2) whether she had medically determinable severe impairments; and (3) whether the impairments met, medically equaled, or functionally equaled the listings. 20 C.F.R. § 416.924(a) (the "listings" refer to the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, app. 1). In order for impairments to meet or equal the severity requirements of the listings, there must be medical findings that met or equaled in severity all of the criteria for the listing. See Sullivan v. Zebley, 493 U.S. 521, 531 (1989).[2] In determining whether an impairment or combination of impairments functionally equals a listing, the ALJ must assess the claimant's functioning in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b).

To functionally equal a listing, the claimant's impairment or combination of impairments must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(d). Social Security regulations define a "marked" limitation in a domain as one that interferes "seriously"

_____

[2]Plaintiff does not contest the ALJ's determination that her impairments did not meet or medically equal a listing.

3

with Plaintiff's ability to independently initiate, sustain or complete activities, and as equivalent to "the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations from the mean." Id. § 416.926a(e)(2). An "extreme" limitation is one that interferes "very seriously" with Plaintiff's ability to independently initiate, sustain, or complete activities, and is equivalent to at least three standard deviations below the mean on standardized testing. Id. § 416.926a(e)(3).

## III.   **FACT RECORD AND THE ALJ'S DECISION**

### A.   **Plaintiff's Background and Medical Evidence**

Plaintiff alleged disability as a result of "[n]erves/ADHD, panic attacks, self inflicted pain, and sleep disorder." Tr. at 128. She was born on March 9, 1999, making her seven years, eight months old on her alleged disability onset date and just over eleven years old as of the ALJ's unfavorable decision. Id. at 102. At the time of the administrative hearing, she was entering fifth grade. Id. at 35. Plaintiff has no work history. Id. at 109-10.

Except as noted, the records all relate to Plaintiff's third grade year in 2007-2008. In August 2007, Plaintiff was evaluated at the Northeast Community Mental Health Center, where she and her family engaged in therapy. Tr. at 218-35. Plaintiff was attending special education classes at the time. Id. at 218. In an August 3, 2007 biopsychosocial evaluation performed by her therapist, Irma Modesto, M.A., Plaintiff was reportedly aggressive at home and at school, unable to stay still, had trouble following directions, and had poor peer/sibling relationships. Id. at 218-19. Ms.

4

Modesto also recorded that, despite her difficulties, Plaintiff liked to be with her friends

and family. Id. at 220. She explained that Plaintiff had a good relationship with her

teachers and staff and had "adequate response with her treatment (medication)." Id. at

223, 227. During the interview, Plaintiff was "friendly and [had] a good rapport with her

counselors." Id. at 227. Ms. Modesto provisionally diagnosed Plaintiff with Attention

Deficit Hyperactivity Disorder ("ADHD")[3] and a GAF score of 50.[4] Id. at 228.

As part of the biopsychosocial evaluation, psychiatrist Oscar Saldaña, M.D.,

provided additional analysis on August 14, 2007. Tr. at 229-34. Dr. Saldaña noted that

Plaintiff had been taking 30mg of Ritalin and 2mg of Risperdal.[5] Id. at 229. He observed

that she was friendly and polite but guarded, impulsive, and restless, and that she sucked

---

[3]"The essential feature of [ADHD] is a persistent pattern of inattention and/or
hyperactivity-impulsivity that is more frequently displayed and more severe than is
typically observed in individuals at a comparable level of development." Diagnostic and
Statistical Manual of Mental Disorders, 4th ed. Text Revision (2000) ("DSM IV-TR"), at
85. (Although the DSM has recently been replaced with a revised fifth edition, I will rely
on the edition in effect at the relevant time.)

[4]The Global Assessment of Functioning ("GAF") score is a measurement of a
person's overall psychological, social, and occupational functioning, and is used to assess
mental health. DSM IV-TR at 32. A GAF score between 41 and 50 indicates "[s]erious
symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any
serious impairment in social, occupational, or school functioning (e.g., no friends, unable
to keep a job)." Id. at 34. A GAF score between 51 and 60 indicates "[m]oderate
symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR
moderate difficulty in social, occupational, or school functioning (e.g., few friends,
conflicts with peers or co-workers)." Id.

[5]Ritalin is prescribed to treat ADHD, while Risperdal is typically used to treat
schizophrenia and biopolar disorder, but may also be used to treat irritability in children.
See www.drugs.com/ritalin.html (last visited 10/15/13);
http://www.drugs.com/risperdal.html (last visited 10/15/2013).

5

her thumb. Id. at 230-31. He further reported that Plaintiff had appropriate affect, that her memory was good, and that she had average intelligence. Id. at 231-32. However, he indicated that her mood was tense and anxious and that her insight and judgment were poor. Id. at 231-32. Dr. Saldaña diagnosed Plaintiff with Impulse Control Disorder, NOS,[6] and Oppositional Defiant Disorder[7] with rule out diagnoses of ADHD and Learning Disorder, NOS. Id. at 233. He assigned her a GAF score of 65.[8] Id.

At the end of 2007, Louis Cataldo, M.A., a licensed psychologist from Assessment & Treatment Alternatives, Inc., performed a comprehensive biopsychosocial evaluation to assess Plaintiff's need for more specialized services, in addition to therapy at the Northeast Mental Health Center, full-time learning support at school, and, since October 2007, Level III "Services to Children in Their Own Home" ("SCOH") twice per week for

---

[6]"The essential feature of Impulse Control Disorders is the failure to resist an impulse, drive, or temptation to perform an act that is harmful to the person or to others." DSM IV-TR at 663. Impulse Control Disorder not otherwise specified ("NOS") refers to disorders of impulse control that do not meet the criteria for the specific impulse disorders, which include Intermittent Explosive Disorder, Kleptomania, Pyromania, Pathological Gambling, and Trichotillomania. Id.

[7]"The essential feature of Oppositional Defiant Disorder is a recurrent pattern of negativistic, defiant, disobedient, and hostile behavior toward authority figures that persist for at least 6 months and is characterized by the frequent occurrence of at least four of the following behaviors: losing temper, arguing with adults, actively defying or refusing to comply with the request or rules of adults, deliberately doing things that will annoy other people, blaming others for his or her own mistakes or misbehavior, being touchy or easily annoyed by others, being angry and resentful, or being spiteful or vindictive." DSM IV-TR at 100 (internal references omitted).

[8]A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM IV-TR at 34.

6

one hour. Tr. at 283-91. Ms. Vargas reported to Mr. Cataldo that Plaintiff had been sexually abused by Ms. Vargas's ex-boyfriend. Id. at 284. Mr. Cataldo also noted that Plaintiff argued with her siblings but was otherwise cooperative at home, had no behavior problems at school, and was "rather passive" with her peers. Id. at 284, 286. Plaintiff was reportedly active at the local Police Athletic League ("PAL") every afternoon. Id. at 286. Mr. Cataldo assessed that Plaintiff had average intelligence and an appropriate but somewhat constricted affect, and recorded that her mood was mildly anxious, her attention was "[a]dequate for the task at hand," and that she had fair judgment and insight. Id. at 287-88. Mr. Cataldo further asserted that Plaintiff was "generally subdued and appeared mildly anxious and restless but was very willing to talk and share information." Id. at 288. He noted that she found school difficult because "'people bother me, call me names, try to get me to fight'" and that she had few friends at school. Id. Plaintiff reported that she did not get along with her siblings but that they could play together sometimes. Id. Mr. Cataldo concluded that Plaintiff did not meet the criteria for a diagnosis of Posttraumatic Stress Disorder ("PTSD"). Id. at 290.[9] He recommended that she begin treatment with a therapist trained in working with victims of sexual abuse, that her SCOH services stay in place, and that she and her family continue therapy and medication management at Northeast Community Mental Health Center. Id. at 290. He

---

[9]"The essential feature of [PTSD] is the development of characteristic symptoms following exposure to an extreme traumatic stressor involving direct personal experience of an event that involves actual or threatened death or serious injury, or other threat to one's physical integrity . . . ." DSM IV-TR at 463.

7

diagnosed her with Adjustment Disorder with Anxiety, Chronic,[10] ADHD (by history),

Learning Disorder, Unspecified (by history), and Victim of Sexual Abuse, and he

assessed a GAF score of 50. Id.

Plaintiff's SCOH social worker, Leslie Rinehart, M.S., from Youth Services, Inc.,

wrote a letter dated February 25, 2008. Tr. at 310-11. Ms. Rinehart explained that her

agency was providing Level III SCOH services in the home twice a week. Id. at 310.

She reported that Plaintiff had recently become a problem in school by being aggressive

and fighting with other students, and getting upset and running out of class while yelling

and crying. Id. As a result of this behavior, Plaintiff was unofficially suspended for one

day. Id. Ms. Rinehart also noted that Plaintiff and her older sister fought, and requested

an evaluation for wraparound services for the whole family. Id. at 310-11.

On March 17, 2008, Robert Slawinski, M.A., from Progressions Behavioral Health

Rehabilitation Services, performed another comprehensive biopsychosocial evaluation to

assess whether Plaintiff should continue to receive behavioral health services. Tr. at 302-

09. Mr. Slawinski noted that Plaintiff and her family were receiving wraparound

services. Id. at 302. He reported that she was fighting in school, running out of the

classroom, hiding under desks, and screaming loudly on a daily basis, and that she fought

with her siblings, was active in PAL, and had two or three friends that she played with

---

[10]"The essential feature of an Adjustment Disorder is a psychological response to
an identifiable stressor or stressors that results in the development of clinically significant
emotional or behavioral symptoms." DSM IV-TR at 679-80. The subtype "with
anxiety" is used "when the predominant manifestations are symptoms such as
nervousness, worry, or jitteriness, or, in children, fears of separation from major
attachment figures." Id. at 680. The specifier "chronic" is used to indicate "persistence
of symptoms for 6 months or longer." Id.

outside of school. Id. at 303-04. Mr. Slawinski observed that Plaintiff was restless and introverted but was able to comply with the interview process and meaningfully participate in discussing her treatment needs, and that she was passively cooperative and exhibited no hyperactivity, but had an irritable and anxious mood and a restricted range of affect. Id. at 305. Plaintiff's attention, concentration, and memory "[a]ppeared adequate under the low demand conditions of the evaluation," she had an average IQ, and fair judgment and insight. Id. at 306. Mr. Slawinski indicated that her key issues included pervasive anxiety associated primarily with her sexual abuse, a suppressive style of managing strong emotions, becoming increasingly difficult to manage at school, and becoming increasingly emotionally reactive, provocative, and confrontational towards peers. Id. He reported that her prognosis was "[f]air given the right supports in place," diagnosed her with Adjustment Disorder with Primarily Anxious Mood, ADHD (combined), Learning Disorder, NOS, and rule-out diagnoses of PTSD and Generalized Anxiety Disorder,[11] and assigned Plaintiff a Children's Global Assessment Scale ("CGAS") score of 42.[12] Id. at 307-08. He concluded that she needed behavioral health

---

[11]"The essential feature of Generalized Anxiety Disorder is excessive anxiety and worry (apprehensive expectation), occurring more days than not for a period of at least 6 months, about a number of events or activities." DSM IV-TR at 472.

[12]The CGAS is a precursor to the GAF scale and is used for children eighteen and under. David Shaffer, et al., A children's global assessment scale (CGAS), 40 Archives of General Psychiatry 1228–31 (1983). It uses a similar 100-point scale, and a score of 41 to 50 denotes:

Moderate degree of interference in functioning in most social areas or severe impairment of functioning in one area, such as might result from, for example, suicidal preoccupations and ruminations, school refusal and other forms of anxiety, obsessive rituals, major conversion symptoms, frequent

rehabilitation services and recommended three hours per week of Behavior Specialist Consultations ("BSC") at home, and 32.5 hours per week of Therapeutic Staff Support ("TSS") at school. Id.

On March 25, 2008, Joseph Knight, Ed. D., a consultative examiner, performed a clinical psychological disability evaluation. Tr. at 245-48. According to Dr. Knight, Plaintiff was currently prescribed 1mg of Risperdal and 10mg of Paxil.[13] Id. at 246. He noted that Plaintiff sucked her thumb during the evaluation. Id. at 245, 246. He reported that she was pleasant and cooperative, had good attention and focus, had low-average intelligence, and was mildly learning disabled. Id. at 246. According to Dr. Knight, Plaintiff could read and perform arithmetic at a second grade level. Id. He also noted that Plaintiff was doing better in school due to therapy, medications, and special education, however, her mother stated that her basic problems still remained. Id. Dr. Knight reported that Plaintiff had emotional problems that interfered with her daily functioning, and that she socialized poorly and tended to withdraw from situations she perceived as threatening. Id. He further asserted that she could learn new information and recall previously learned information, but that she often needed encouragement in order to participate. Id. at 247. Dr. Knight concluded that Plaintiff was a "learning disabled child who is adjusting well in her special education program. She does not meet

anxiety attacks, poor to inappropriate social skills, frequent episodes of aggressive or other antisocial behavior with some preservation of meaningful social relationships.

Id.

[13]Paxil is used to treat a number of disorders including anxiety and PTSD. http://www.drugs.com/paxil.html (last visited 10/15/13).

10

the criteria for attention deficit hyperactivity disorder." Id. He diagnosed her with PTSD and Phase of Life Problem.[14] Id. He further concluded that her situation was uncertain and that she should continue therapy and medication. Id. at 248.

On March 31, 2008, James Cunningham Ed. D., a state agency psychiatrist, completed a childhood disability evaluation. Tr. at 239-44. Dr. Cunningham concluded that Plaintiff had Impulse Control Disorder and a learning disability[15] which were severe but did not meet, medically equal or functionally equal a listed impairment. Id. at 239. He found that she had less than marked limitations in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for yourself, and no limitations in the domains of moving about and manipulating objects, and health and physical well-being. Id. at 241-42.

The only document in the medical record dating from Plaintiff's year in the fourth grade is a July 24, 2009 "to whom it may concern" letter from BSC worker Lynne Gulin. Tr. at 318-19. Ms. Gulin wrote that Plaintiff had tantrums and isolated easily and quickly, postulated that her tantrums and nightmares were due to posttraumatic stress, presumably from sexual abuse, and concluded that Plaintiff needed weekly mental health services. Id. at 318.

---

[14]Phase of Life Problem is used "when the focus of clinical attention is a problem associated with a particular developmental phase or some other life circumstance that is not due to a mental disorder or, if it is due to a mental disorder, is sufficiently severe to warrant independent clinical attention." DSM IV-TR at 742.

[15]Specifically, Dr. Cunningham stated that Plaintiff's impairments were "Impulse Control dis., LD." Tr. at 239. Based on the record, I assume that "LD" refers to learning disorder.

11

In addition to these medical records, the record also contains two teacher questionnaires and a functional behavior assessment from her school district. First, in January 2008, Plaintiff's third grade teacher, Madeline DiCianni, and school nurse, Christine Blicci, R.N., completed the first teacher questionnaire. Tr. at 135-42. They reported that Plaintiff had three 45-minute special education periods per week for both math and reading. Id. at 135. They rated Plaintiff on a number of activities using a numerical scale where 1 was "no problem," 2 was "a slight problem," 3 was "an obvious problem," 4 was a "serious problem," and 5 was a "very serious problem." Id. at 136. In the area of acquiring and using information, they opined that Plaintiff had obvious problems in the activities of: (a) reading and comprehending written material; (b) comprehending and doing math problems; (c) providing organized oral explanations and adequate descriptions; (d) recalling and applying previously learned material; and (e) applying problem-solving skills in class discussions. Id. In the area of caring for himself or herself, they found obvious problems in the activity of handling frustrations appropriately. Id. at 140. In all other areas, Mss. DiCianni and Blicci rated Plaintiff as having no problems or only slight problems. Id. at 136-40. They concluded that Plaintiff "is able to remain focused and on task while in school while taking medication and receiving therapy. She is able to function in a regular education program with support." Id. at 141. They further reported that Plaintiff took 10mg of Ritalin and unknown dosage of Risperdal. Id.

The School District of Philadelphia created a functional behavior assessment for Plaintiff on February 9, 2009, when Plaintiff was in fourth grade. Tr. at 292-301. The

assessment provided that Plaintiff currently took 2mg of Risperdal as a sleep aid and in the past had been prescribed Ritalin and Paxil. Id. at 292. The behavior of concern was listed as repeated episodes of "verbal aggression" at school during which she interrupted teachers and argued with peers. Id. at 293. Plaintiff was observed twice as part of the assessment. During these observations, she was seen having difficulty following directions and being inattentive, being hyperactive on one occasion, being disorganized, and relating to others poorly during one observation and fair during the other. Id. at 295. However, the observers also noted that Plaintiff complied when limits were set and that she followed rules and got back on track when cued to do so. Id. In a reevaluation report appended to the assessment, Plaintiff was described as a "pleasant child who was willing to participate in testing activities," was "easy to understand and able to communicate her ideas without difficulty." Id. at 298. She was further described as having "maintained an appropriate level of activity throughout the evaluation and attention span was sustained," was "able to follow directions," and was "engaging socially and responded well to rapport building activities." Id. However, the evaluator noted that she sucked her thumb. Id.

On July 7, 2009, Plaintiff's fourth grade teacher, Stephen Yates completed the second teacher questionnaire. Tr. at 161-68. He related that Plaintiff was on the third grade level for reading, math and written language and that she had daily special education in these subjects. Id. at 161. On the same five-point scale described above, in the domain of acquiring and using information, Mr. Yates provided that Plaintiff had serious problems in: (a) reading and comprehending written material; (b) comprehending

13

and doing math problems; (c) learning new material; and (d) recalling and applying previously learned material. Id. at 162. Mr. Yates listed Plaintiff as having obvious problems in the following activities: (a) comprehending oral instructions; (b) understanding school and content vocabulary; (c) understanding and participating in class discussions; (d) providing organized oral explanations and adequate descriptions; (e) expressing ideas in written form; and (e) applying problem-solving skills in class discussions. Id. Mr. Yates wrote that Plaintiff "typically struggles with focus and comprehension unless she is receiving one-on-one attention." Id.

In the domain of attending and completing tasks, Mr. Yates concluded that Plaintiff had serious problems in: (a) completing class/homework assignments; (b) working without distracting self or others, and (c) working at reasonable pace/finishing on time. Tr. at 163. He found that Plaintiff had obvious problems in the activities of: (a) sustaining attention during play/sports activities; (b) focusing long enough to finish assigned activity or task; (c) refocusing to task when necessary; (d) carrying out multistep instructions; (e) organizing own things or school materials; and (f) completing work accurately without careless mistakes. Id. Mr. Yates assigned Plaintiff no problems to slight problems for the remaining four activities. Id. He further provided that Plaintiff "has particular difficulty completing class and home assignments, working independently, and doing so in a timely fashion typical of a regular ed. student." Id.

In the domain of interacting and relating with others, Mr. Yates listed serious problems in making and keeping friends, and obvious problems in the activities of: (a) playing cooperatively with other children; (b) relating experiences and telling stories; (c)

14

introducing and maintaining relevant and appropriate topics of conversation; and (d) using adequate vocabulary and grammar to express thoughts/ideas in general, everyday conversation. Tr. at 164. In the seven remaining activities, Mr. Yates rated Plaintiff as having no problem or a slight problem. Id.

In the domain of caring for himself or herself, Mr. Yates described Plaintiff has having serious problems in: (a) handling frustration appropriately; (b) responding appropriately to changes to own mood; and (c) using appropriate coping skills to meet daily demands of school environment. Tr. at 166. He described obvious problems in the activities of: (a) being patient when necessary; (b) cooperating in, or being responsible for, taking needed medications; (c) identifying and appropriately asserting emotional needs; and (d) knowing when to ask for help. Id. In the remaining three categories, Mr. Yates asserted that Plaintiff had no problems or only a slight problem. Id.

Mr. Yates concluded his questionnaire by asserting that Plaintiff and he "developed a positive rapport, and she responds respectfully to my presence. Nevertheless, she would greatly suffer were she not to continue to receive assistance." Tr. at 168.

## B. The Administrative Hearing Testimony and the ALJ's Decision

During the May 29, 2008 hearing, Plaintiff asserted that she had done "good" in school the previous year but acknowledged that she had been suspended. Tr. at 35-36. She claimed that she had a couple of friends and fought with her siblings. Id. at 36-37. Ms. Vargas contended that Plaintiff was destructive at home, did not follow directions, and fought and argued. Id. at 39. She alleged that she had to constantly remind Plaintiff

15

to perform basic activities like brushing her teeth and getting dressed. Id. She also

stated that she agreed with the assessment of Plaintiff's fourth grade teacher, Mr. Yates,

and asserted that at school, Plaintiff could not focus and fought with her peers. Id. at 41-

42, 47.

In the April 15, 2010, decision, the ALJ found:

1.  At step one, Plaintiff had never engaged in substantial gainful activity. Id. at 19.

2.  At step two, Plaintiff had severe impairments of Learning Disorder, Oppositional Defiant Disorder, and PSTD. Id.

3.  At step three, Plaintiff did not have an impairment or combination of impairments that met or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id. at 20.

4.  Plaintiff did not have an impairment or combination of impairments that functionally equaled a listing. Id. Specifically, the ALJ found that Plaintiff had less than marked limitations in the domains of: (a) acquiring and using information, id. at 22; (b) attending and completing tasks, id. at 23; and (c) interacting and relating with others. Id. at 24. He found no limitations in: (a) moving about and manipulating objects, id. at 25; (b) caring for yourself, id. at 26; and (c) health and physical well-being. Id.

Accordingly, the ALJ concluded that Plaintiff had not been under a disability. Id.

Plaintiff raises two arguments asserting that the ALJ's decision is legally

insufficient and not supported by substantial evidence. First, Plaintiff contends that the

ALJ legally erred by failing to discuss or evaluate the three GAF and CGAS scores of 50

and below. See Doc. 9 at 15-19. Second, Plaintiff contends that the ALJ's conclusion

that her impairments did not functionally equal a listing violated Social Security Ruling

("SSR") 09-1p. Id. at 19-25. Defendant argues that the ALJ's decision is legally

sufficient and supported by substantial evidence. See Doc. 12.

## IV.    DISCUSSION

### A.    The ALJ's Failure to Explicitly Consider Plaintiff's GAF Scores

The Social Security Administration has concluded that GAF scores do not have a

"direct correlation to the severity requirements." 65 F.R. 50746-01, 50764-765 (Aug. 21,

2000). Nonetheless, it acknowledges that the GAF scale is used by mental health

professionals to "assess current treatment needs and provide a prognosis." Id. As a result,

the courts in this district have repeatedly held that such scores are medical evidence that

must be considered and addressed by the ALJ. See e.g. Colon v. Barnhart, 424 F. Supp.

2d 805, 812 (E.D. Pa. 2006); Salgado v. Astrue, 06-CV-3119, 2007 WL 2404713, at * 1

(E.D. Pa. Aug. 13, 2007) (and the cases cited therein). It is well established, in general,

that "[t]he ALJ must consider all the evidence and give some reason for discounting the

evidence she rejects." Plummer, 186 F.3d at 429.

There are four GAF and CGAS scores in the record, three of which are 50 or

below.[16] The ALJ did not mention or discuss any of these scores. Instead, the ALJ's

decision focuses primarily upon the reports from Plaintiff's teacher and from the

consultative examiner, Dr. Knight. Indeed, Dr. Knight is the only relevant medical

professional the ALJ identified by name. When citing to the reports which include GAF

scores, the ALJ did not address any of the reports individually but merely grouped them

all together in making generalized conclusions. See tr. at 21 (providing that "most of the

_____

[16]Specifically, Ms. Modesto àssigned Plaintiff a 50 GAF score on August 3, 2007, tr. 228, Dr. Saldaña assigned her a 65 GAF score on August 14, 2007, id. at 233, Mr. Cataldo assigned her a 50 GAF score in December 2007, id. at 290, and Mr. Slawinski assigned her a CGAS score of 42 on March 17, 2008. Id. at 308.

17

evaluators noted that the claimant maintained attention during examinations and interacted well with them"); 22 (asserting that "some evaluators noted that the claimant had average intelligence, good attention span and good focus"); and 24 (noting that "evaluators reported that while the claimant prefers to be alone, she has friends and engages in social interaction with them").

Plaintiff contends that the ALJ's failure to specifically discuss any of her GAF scores, especially those under 50, is a legal error. In support of this argument, she cites to over a dozen cases in which judges in this district have agreed with that assessment. See Doc. 9 at 15-16. Defense counsel cites to three district court cases and one Third Circuit case for the proposition that such a failure does not warrant a remand. See Doc. 12 at 15-16. Two of the cases cited by Defendant, including one Eastern District case that was affirmed by the Third Circuit, are immediately distinguishable from Plaintiff's case.[17]

In the first case cited by Defendant, Rios, the court specifically distinguished the case from those where "an ALJ fails to address a claimant's GAF scores or their significance at all." Rios v. Astrue, 09-CV-5004, 2010 WL 3860458, at 8 (E.D. Pa. Sept. 30, 2010), aff'd, 444 F. App'x 532 (3d Cir. 2011). The Rios court concluded that the fact that the ALJ did not discuss two GAF scores of 50 was not determinative since she had

---

[17]To the extent that the third district court case cited by Defendant, Liggitt from the Western District of Pennsylvania, conflicts with my conclusions, I decline to adopt its reasoning. See Liggitt v. Comm'r of Soc. Sec., Civ. No. 10-1024, 2011 WL 2458054, at *11-12 (W.D. Pa. May 20, 2011), report and recommendation adopted, Civ. No. 10-1024, 2011 WL 2445861 (W.D. Pa. June 16, 2011). I also note that the court's observation that the claimant's "treating sources failed to discuss -- in any manner -- the reasons for assessing the GAF scores found in some of their reports," id at *12, does not apply to the reports in this case, where the treating sources provided detailed observations and assessments that served as a basis for the GAF scores.

discussed one other score of 50-55. Id. The court further held that discussion of the two additional GAF scores of 50 "would have added little to the ALJ's prior analysis" and that a remand would have been futile, albeit remarking that "the ALJ would have aided review of her choice to exclude these two scores from her analysis had she provided some rationale for their omission." Id. Indeed, in Rios, the court recognized that "GAF scores '*must* be addressed by an ALJ in making a determination regarding a claimant's disability.'" Id. (emphasis in original) (quoting Watson v. Astrue, 08-CV-1858, 2009 WL 678717, at *5 (E.D. Pa. Mar. 13, 2009)).

Similarly, in the second district court case cited by Defendant, Fasciano, the court recognized that "the ALJ did indeed consider Plaintiff's GAF scores" and "expressly addressed the GAF score of 45." Fasciano v. Comm'r of Soc. Sec., 08-CV-802, 2009 WL 765175, at *1 n.1 (W.D. Pa. Mar. 23, 2009). As with Rios, Fasciano is instantly distinguishable based on the ALJ's consideration of some of the GAF scores.

Defendant also cites to Gilroy v. Astrue, a non-precedential Third Circuit case. 351 F. App'x 714 (3d Cir. 2009). In Gilroy, the Third Circuit concluded that the ALJ did not significantly err by failing to discuss a GAF score of 45. The court explained that "[w]hile [the ALJ's decision] did not make explicit reference to [the doctor's] one-time rating of GAF 45, it did make repeated references to observations from [his] reports." Id. at 716. The court further noted that the doctor failed "to 'express any opinions regarding specific limitations' or otherwise to explain the basis for his GAF rating." Id.

Unlike in Gilroy, the ALJ in this case did not provide any meaningful or in-depth individual examination of the records which contained the four GAF/CGAS scores.

19

Instead, the ALJ merely inserted a few generalized conclusions condensed from a number of reports. It is on this basis that I distinguish the outcome in Gilroy from the present situation. In light of the limited reference to, and discussion of, the reports at issue, I am unable to properly assess whether the ALJ sufficiently considered these reports and the GAF scores within. As a result, and guided by the Eastern District cases ordering remands under these conditions, I recommend that the case be remanded for further consideration of the reports of Ms. Modesto, Dr. Saldaña, Mr. Cataldo, and Mr. Slawinski and the GAF scores they assigned to Plaintiff. See e.g. West v. Astrue, 09-CV-2650, 2010 WL 1659712, at \*5-6; (E.D. Pa. Apr. 26, 2010) (remanding the case due to the ALJ's failure to examine five GAF scores); Nieves v. Astrue, 08-CV-5178, 2010 WL 629831, at \*5 (E.D. Pa. Feb. 19, 2010) (providing that the "[f]ailure to discuss a GAF score that supports serious impairments in social or occupational functioning requires remand"); Watson, 2009 WL 678717, at \*6 (recognizing that courts in this district have held that "a remand is necessary when an ALJ fails to specifically discuss GAF scores"); Escardille v. Barnhart, 02-CV-2930, 2003 WL 21499999, at \*6-7 (E.D. Pa. June 24, 2003) (remanding due to the ALJ's failure to discuss GAF scores that contradicted his conclusions).

Specifically, upon remand, I recommend that the ALJ reconsider the entirety of the record regarding Plaintiff's mental impairments and explicitly reference and discuss her GAF scores.

## B.    The ALJ's Functional Equivalency Determination

Plaintiff asserts that the ALJ erred in finding that she did not functionally equal a listing. Specifically, Plaintiff contends that the ALJ's conclusion that she had less than marked limitations in the domains of (a) acquiring and using information, (b) attending and completing tasks, (c) interacting and relating with others, and (d) caring for yourself, violates SSR 09-1p. See Doc. 9 at 19-23.

SSR 09-1p describes the Social Security Administration's "whole child" approach which takes into account "the interactive and cumulative effects of the [child's] impairments" and "starts with a consideration of [the child's] actual functioning in all settings." SSR 09-1p, 2009 WL 396031 (Feb. 17, 2009). The "whole child" approach requires the ALJ to determine "how the child functions every day and in all settings compared to other children the same age who do not have impairments." Id. The extent to which a child can independently perform activities is one factor in determining how that child functions. Id.

Plaintiff contends that the ALJ did not adequately take into account the degree of difficulty that she has with independently completing tasks, the amount of help that she needs to perform activities, and the extent to which she requires a structured and supportive setting to perform adequately. For example, she contends that, despite the fact that she has a TSS worker for 32.5 hours per week at school, Mr. Yates' teacher questionnaire shows that she still has many obvious or serious problems in these four domains.

21

While the ALJ did mention Plaintiff's assistive services in his decision, I agree with her that they were not the focus of the decision. Tr. at 19. I also agree with Plaintiff that it is not clear whether the ALJ properly assessed Mr. Yates' teacher questionnaire, as well as Ms. Vargas' testimony. When discussing the reports from these two sources, the ALJ did not accurately describe their content, which makes it very difficult to determine whether he properly considered them.

The ALJ stated that he gave substantial weight to the teachers' opinions, including that of Mr. Yates. Tr. at 21. Regarding the fourth grade teacher questionnaire, Mr. Yates rated Plaintiff as having serious problems in four activities from the domain of acquiring and using information, three in attending and completing tasks, one in interacting and relating with others, and three in caring for himself or herself. Id. at 162-66. Despite the many serious problems identified by Mr. Yates, the ALJ concluded that "even in fourth grade, the claimant's limitations are less than marked and are consistent with the state agency mental consultant's opinion and the consultative examiner's opinion." Id at 21. This conclusion appears contrary to Mr. Yates' questionnaire, which along with the school district's February 9, 2009 functional behavior assessment, constitutes the only evidence of Plaintiff's functioning in the fourth grade.[18] The contrast between Mr. Yates' questionnaire and the March 31, 2008 childhood disability evaluation of Dr. Cunningham, the state agency psychiatrist, is especially pronounced given that Dr.

---

[18]The only other record from Plaintiff's fourth grade year is the July 24, 2009 letter from BSC worker Lynn Gulin recommending weekly mental health services in view of Plaintiff's tantrums and nightmares due to PTSD. Tr. at 318.

Cunningham assessed Plaintiff with less than marked limitations in all domains, indicating less than serious problems. Id. at 241-42.

Similarly, when discussing the domain of attending and completing tasks, the ALJ provided that Mr. Yates "reported *slight to obvious problems* in this area of functioning because [Plaintiff] has difficulty completing class and homework assignments, working independently, and doing so in a timely manner." Tr. at 23 (emphasis added). In fact, Mr. Yates selected the rating for "*serious problems*" in the activities of completing assignments, working without distracting herself and others, and timely finishing her assignments. Id. at 163 (items 10, 12 & 13). Mr. Yates specifically noted that Plaintiff "has particular difficulty completing class and home assignments, working independently, and doing so in a timely fashion typical of a regular ed. student." Id.. This inaccurate depiction of Mr. Yates' questionnaire, upon which the ALJ placed significant weight, calls into question the ALJ's conclusions.

The ALJ also inaccurately summarized Ms. Vargas' testimony. The ALJ stated twice in his decision that Ms. Vargas testified that the claimant was doing well due to her medications, therapy, and special education. Tr. at 21, 22. While Ms. Vargas did testify regarding Plaintiff's assistive services at home and school and her psychiatric care and medications, she did not opine on whether it had been helpful and certainly did not testify that Plaintiff was "doing well." See id. at 39-45. Instead, Ms. Vargas testified that Plaintiff is "destructive. She doesn't follow directions at home. She fights, argues a lot. We have to direct her to do everything basically, like brush her teeth, brush her hair, get dressed. We got to constantly keep reminding her to do it." Id. at 39. She further

23

testified that at school, Plaintiff "can't focus," starts arguments and fights, and that "[t]hey got to keep her in a close watch because she will pick up a sharp object." Id. at 47.

In light of the dichotomy between the ALJ's depiction of this evidence and the actual content of the evidence, I cannot tell whether the ALJ properly considered the evidence, nor am I able to conclude that the ALJ's functional equivalency determination was supported by substantial evidence. I have already recommended that the case be remanded so that the ALJ can explicitly consider the GAF scores. I further recommend that during the reconsideration of this case, the ALJ also re-evaluate whether Plaintiff functionally equals a listing, giving due weight to her assistive services, and clearly explaining how he arrived at his conclusions, citing to and distinguishing evidence in the record as necessary.[19]

---

[19]Plaintiff also appears to argue that because some of her limitations are listed in 20 C.F.R. § 416.926a as examples of limited functioning in the domains, those limitations should be deemed marked.

Specifically, plaintiff contends that she has the following limitations which are also listed as examples in the regulation: in the domain of acquiring and using information, difficulty in solving mathematics questions, 20 C.F.R. § 416.926a(g)(3)(iv); in the domain of attending and completing tasks, (a) repeatedly becoming sidetracked from activities or frequently interrupting others; (b) being easily frustrated and giving up on tasks, including ones that the child is capable of completing; and (c) requiring extra supervision to keep the child engaged in an activity, id. § 416.926a (h)(3)(iii), (iv), (v); in the domain of interacting and relating with others, (a) having no close friends; and (b) difficulty communicating with others, id. § 416.926a (i)(3)(ii), (v); and in the domain of caring for yourself, the frequent use of self-soothing activities that show developmental regression, such as thumb sucking. Id. § 416.926a (k)(3)(ii).

I disagree with Plaintiff that merely because some of her limitations are also listed as examples in 20 C.F.R. § 416.926a, those limitations should be deemed marked. Indeed, before providing example limitations in each domain, the regulation specifically

24

## V.  CONCLUSION

The ALJ failed to explicitly consider the GAF and CGAS scores assigned to Plaintiff. The ALJ also inaccurately summarized certain evidence, particularly Mr. Yates' teacher questionnaire and Ms. Vargas' testimony, which calls into question his conclusions based on that evidence. On remand, I recommend that the ALJ explicitly consider the GAF and CGAS scores and articulate his conclusions regarding them. I also recommend that the ALJ reassess his conclusions regarding whether Plaintiff functionally equaled a listing, especially keeping in mind Plaintiff's limitations in her ability to function independently, and accurately describe the evidence he considered and the reasons for accepting or discounting that evidence.

---

provides that those "examples do not necessarily describe a 'marked' or 'extreme' limitation." Id. § 416.926a(g)(3), (h)(3), (i)(3), (j)(3), (k)(3), (l)(3).

Therefore, I make the following:

## R E C O M M E N D A T I O N

AND NOW, this 31st day of October, 2013, it is RESPECTFULLY

RECOMMENDED that the case be remanded to the Commissioner pursuant to

sentence four of 41 U.S.C. § 405(g) for further proceedings consistent with this

Report, Judgment be entered REVERSING the decision of the Commissioner of

Social Security for the purposes of the remand only, and the relief sought by

Plaintiff be GRANTED to the extent that the matter be REMANDED for further

proceedings consistent with this adjudication.  The Parties may file objections to

this Report and Recommendation.  See Local Civ. Rule 72.1.  Failure to file timely

objections may constitute a waiver of any appellate rights.

ENTERED

NOV - 1 2013

CLERK OF COURT

BY THE COURT:

ELIZABETH T. HEY
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ELIZABETH VARGAS ON BEHALF OF : CIVIL ACTION
B.L.D.T.V. :
:
v. : NO. 12-03317
:
CAROLYN W. COLVIN, :
ACTING COMMISSIONER OF :
SOCIAL SECURITY :

## ORDER

AND NOW, this          day of                    , 2013, upon careful and

independent consideration, the record reveals that the Commissioner did not apply correct

legal standards and that it is unclear whether the ALJ's findings of fact and conclusions

of law are supported by substantial evidence. As a result, this action must be remanded

to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g). Therefore, it is

hereby ORDERED that:

1. The Report and Recommendation is APPROVED AND ADOPTED;

2. Judgment is entered REVERSING the decision of the Commissioner of
   Social Security for the purposes of this remand only and the relief sought
   by Plaintiff is GRANTED to the extent that the matter is REMANDED for
   further proceedings consistent with this adjudication;

3. The Clerk of Court is hereby directed to mark this case closed.

BY THE COURT:

_____
RONALD L. BUCKWALTER, J.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

10/31/13

RE:    Vargas vs Colvin
        CA No. 12-3317

## NOTICE

        Enclosed herewith please find a copy of the Report and Recommendation filed by United States Magistrate Judge Hey, on this date in the above captioned matter.  You are hereby notified that within fourteen (14) days from the date of service of this Notice of the filing of the Report and Recommendation of the United States Magistrate Judge, any party may file (in duplicate) with the clerk and serve upon all other parties written objections thereto (See Local Civil Rule 72.1 IV (b)).  **Failure of a party to file timely objections to the Report & Recommendation shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court Judge.**

        In accordance with 28 U.S.C. §636(b)(1)(B), the judge to whom the case is assigned will make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  The judge may accept, reject or modify, in whole or in part, the findings or recommendations made by the magistrate judge, receive further evidence or recommit the matter to the magistrate judge with instructions.

        Where the magistrate judge has been appointed as special master under F.R.Civ.P 53, the procedure under that rule shall be followed.

                           MICHAEL E. KUNZ
                           Clerk of Court

                         By:_____

                         Joe Lavin , Deputy Clerk

cc:    Courtroom Deputy to Judge  Buckwalter
       A. Lynch, D. Griffin, M. Boyle, M. Scotese

civ623.frm
(11/07)

2:12-cv-03317-RB

MICHELLE   SCOTESE
SSA OFFICE OF GENERAL COUNSEL                    michelle.scotese@ssa.gov
300 SPRING GARDEN STREET
PHILADELPHIA  PA  19123

— — — — — — — — — — — — — —

2:12-cv-03317-RB

MICHAEL  PATRICK  BOYLE

215-546-3931
mpboyle.law@verizon.net

123 S. BROAD ST
STE 2140
PHILADELPHIA  PA  19109

— — — — — — — — — — — — — —

2:12-cv-03317-RB

DINA WHITE GRIFFIN
OFFC. OF THE GENERAL COUNSEL          dina.griffin@ssa.gov
300 SPRING GARDEN STREET
6TH FLOOR
PHILADELPHIA PA 19123

— — — — — — — — — — — — — — —

2:12-cv-03317-RB

ANDREW C. LYNCH
SSA/OGC REGION 3                                andrew.lynch@ssa.gov
300 SPRING GARDEN STREET
6TH FL
PHILADELPHIA  PA  19123

— — — — — — — — — —— — — —— — —